**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914)-874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (*pro hac vice*)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

JUHYUN SO, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HYATT CORPORATION,

Defendant.

Civil Action No.: 1:25-CV-10483

Hon. Matthew F. Kennelly

**OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE(S)**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 3

A. Plaintiff Never Consented To Hyatt's Privacy Policy ........ 3

1. Hyatt's Consent Defense Fails As A Matter Of Law Because Plaintiff Never Unambiguously Assented To Hyatt's Privacy Policy ........ 3

B. Hyatt's Privacy Policy Does Not Authorize The Data Sharing At Issue Here ........ 8

C. Plaintiff States An ECPA Claim ........ 11

1. Hyatt's Own Participation in Intercepting Plaintiff's Communications Does Not Immunize it of Liability Because it Committed a "tortious act in violation of the … laws … of any State." 18 U.S.C. § 2511 (2)(d). ........ 11

2. Plaintiff's Communications Were Intercepted In Transit ........ 19

3. Plaintiff's Hotel Bookings Were Communicative Content ........ 19

4. Hyatt's Use Of Trackers For Targeting Advertising Is "Procurement" ........ 20

D. Hyatt's Motion To Strike Is Premature ........ 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*A.D. v. Aspen Dental Mgmt., Inc.*,
2024 WL 4119153 (N.D. Ill. Sept. 9, 2024) .......... 15

*Allen v. Midwest Express Care, Inc.*,
2025 WL 2240253 (N.D. Ill. Aug. 6, 2025) .......... 16

*Anand v. Heath*,
2019 WL 2716213 (N.D. Ill. June 28, 2019) .......... 4, 7, 8

*Arres v. IMI Cornelius Remcor, Inc.*,
333 F.3d 812 (7th Cir. 2003) .......... 1, 15

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... passim

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......... 13

*Bryan v. United States*,
524 U.S. 184 (1998) .......... 16

*Buonomo v. Optimum Outcomes, Inc.*,
301 F.R.D. 292 (N.D. Ill. 2014) .......... 21

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 9, 10

*Campos v. Tubi, Inc.*,
716 F. Supp. 3d 623 (N.D. Ill. 2024) .......... 5, 7, 8

*Crano v. Sojern, Inc.*,
2025 WL 2689267 (N.D. Cal. Sept. 19, 2025) .......... 18

*Dawson v. Univ. of Phoenix, Inc.*,
2026 WL 92248 (N.D. Ill. Jan. 13, 2026) .......... 12, 13, 19, 20

*Domer v. Menard, Inc.*,
116 F.4th 686 (7th Cir. 2024) .......... 3, 8, 9

*Gardner v. Me-TV Nat'l Ltd. P'ship*,
132 F.4th 1022 (7th Cir. 2025) .......... 12, 14

*Howlett By & Through Howlett* v. *Rose,*
("Howlett"), 496 U.S. 356 (1990) .......... 1, 14

*In re Grp. Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023) .......... 13

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 19

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 10

*In re TikTok, Inc. In-App Browser Priv. Litig.*,
2024 WL 4367849 (N.D. Ill. Oct. 1, 2024) .......... 9

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 20

*Johnson Hum. Power of N Co.*,
767 F. Supp. 3d 845 (N.D. Ill. 2025) .......... 6, 7

*Kurowski v. Rush Sys. for Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) .......... 13

*Kurowski v. Rush System for Health*,
2024 WL 3455020 (N.D. Ill. July 18, 2024) .......... 1, 15, 16

*Lugo v. Inova Health Care Servs.*,
2025 WL 905191 (E.D. Va. Mar. 25, 2025) .......... 13

*Marshall v. Georgetown Mem'l Hosp.*,
112 F.4th 211 (4th Cir. 2024) .......... 8

*Mudd-Lyman Sales & Serv. Corp. v. United Parcel Serv., Inc.*,
236 F. Supp. 2d 907 (N.D. Ill. 2002) .......... 15, 17

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) .......... 13

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .......... 2, 12, 14

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 3, 4, 7

*Smith v. Loyola Univ. Med. Ctr.*,
2024 WL 3338941 (N.D. Ill. July 9, 2024) .......... 16

*Snyder v. G6 Hosp. LLC*,
2025 WL 1254382 (C.D. Cal. Apr. 14, 2025) ..... 18

*So v. Hyatt Corp.*,
2025 WL 2994995 (C.D. Cal. Aug. 25, 2025) ..... 2, 7

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ..... 2, 11, 14, 15

*Stewart v. Parkview Hosp.*,
940 F.3d 1013 (7th Cir. 2019) ..... 14

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) ..... 18

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) ..... 19

*Valentine v. Wideopen W. Fin., LLC*,
288 F.R.D. 407 (N.D. Ill. 2012) ..... 20

*Welbel v. Shout! Factory, LLC*,
2026 WL 266561 (N.D. Ill. Feb. 2, 2026) ..... 2, 12

**STATUTES**

18 U.S.C. § 2510(3) ..... 15

18 U.S.C.§ 2511(a) ..... 20

18 U.S.C. § 2511 (2)(d) ..... passim

18 U.S.C. § 2710(b)(1)-(2) ..... 12

20 U.S.C. § 1232g(b)(1) ..... 13

Cal. Civ. Code § 53.5 ..... passim

Cal. Civ. Code § 53.5(c) ..... 17

## I. INTRODUCTION

Hyatt Corporation ("Defendant" or "Hyatt") owns and operates a chain of hotels throughout the United States. To boost its advertising efforts, Hyatt installed Adobe's and Meta's tracking technologies on its hotel booking website. As a result, whenever users like Plaintiff answered questions on Hyatt's website and booked rooms at Hyatt properties, Meta and Adobe discovered *who* exactly stayed at *which* hotel, on *which* dates they came and on *which* dates they left, along with *how* many adults and children they had with them. Meta and Adobe also intercepted user's unique identifiers and the first names, last names, and phone numbers that users typed into online form fields. For example, through Advanced Matching, Meta knew *who exactly* was booking a room, as they were booking it online. Taking issue with this unconsented-to interception of private information, Plaintiff Juhyun So, a Californian, initially filed this as a California Invasion of Privacy Act ("CIPA") claim.

The matter is before the Court because Hyatt elected to enforce its Terms & Conditions, which contained Illinois forum-selection and choice-of-law clauses. In doing so, Hyatt effectively required Plaintiff to amend his complaint to assert a claim under the Electronic Communications Privacy Act ("ECPA"). The ECPA is a federal law, and "[f]ederal law[s] … are as much laws in the States as laws passed by the state legislature." *Howlett By & Through Howlett v. Rose* ("*Howlett*"), 496 U.S. 356, 367 (1990). "The Supremacy Clause … requires Illinois to treat federal law as part of state law." *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 814 (7th Cir. 2003).

Because Hyatt does not like what this federal law has to say about its conduct, it tries to add words into the ECPA that do not exist. As this Court already recognized, the ECPA does not require a communication be intercepted for the "*sole* purpose" of committing a tortious act; only that committing the act was *a* "purpose." *Kurowski v. Rush System for Health*, 2024 WL 3455020, at *5 (N.D. Ill. July 18, 2024) (Kennelly, J.) (emphasis in original). Nor does ECPA require the

tortious act be a violation of Illinois state law; it only requires the "tortious act [be] in violation of the Constitution or *laws* of the United States *or of any State*." 18 U.S.C. § 2511(2)(d) (emphasis added). And here, Plaintiff alleged Hyatt violated California's Guest Record Statute, which says a "hotelkeeper … shall not disclose … any part of a guest record … to a third party ...." Cal. Civ. Code § 53.5. As numerous courts have found, the alleged sharing of private information to tech companies like Meta and Adobe for the purposes of targeted advertising is *a tortious act*—akin to "the tort of public disclosure." *Welbel v. Shout! Factory, LLC*, 2026 WL 266561, at *1 (N.D. Ill. Feb. 2, 2026); *accord Salazar v. Nat'l Basketball Ass'n,* 118 F.4th 533, 542 (2d Cir. 2024).

Hyatt lambasts Plaintiff's legal theory as "absurd," Def.'s Mem. Supp. Mot. to Dismiss, ECF No. 54 at 7 ("MTD"), "nonsensical," *id*. at 14, and "hopelessly overbroad," *id*. at 19. But "Courts from coast to coast have recognized that a violation of [various state and federal laws prohibiting the disclosure certain types of private information] can give rise to [claims] under the ECPA." *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *5 (N.D. Ill. Feb. 21, 2025) (collecting cases). These cases involve violations HIPAA, FERPA, VPPA, and their various state law analogs, which all prohibit certain custodians from disclosing certain pieces of private information—*i.e.*, health records, educational records, and video viewing records. For all its motion's bluster, Hyatt cannot muster a single meaningful distinction between these laws and the Guest Records Statute at issue here, Cal. Civ. Code § 53.5.

Hyatt's argument that Plaintiff consented to the data tracking through its Privacy Policies is especially not well-taken. For starters, not once does the Privacy Policy inform users that Hyatt will disclose its private guest records with Meta and Adobe. Second, it misrepresents the Transferor order when it says Plaintiff already assented to its *Privacy Policy*. The transferor court *only* found that Plaintiff "assented to the *Membership Terms*." *So v. Hyatt Corp.*, 2025 WL 2994995, at *7 (C.D. Cal. Aug. 25, 2025) (emphasis added). These are two entirely separate legal

documents. And "where a website specifically states that clicking means one thing, that click does not bind users to something else." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) (citation omitted). Hyatt's online interfaces likewise never informed Plaintiff that his actions would constitute assent to its *Privacy Policy.* Hyatt's remaining arguments rest on readings of the ECPA at odds with the law's text, and which this Court, and others, have rejected. Its motions should be denied.

## II. ARGUMENT

### A. Plaintiff Never Consented To Hyatt's Privacy Policy

#### 1. <u>Hyatt's Consent Defense Fails As A Matter Of Law Because Plaintiff Never Unambiguously Assented To Hyatt's Privacy Policy</u>

Hyatt spends the bulk of its motion arguing that Plaintiff consented to the alleged tracking through his World of Hyatt membership and through the booking interface. But this argument stumbles out the gate because Hyatt cannot show Plaintiff ever "unambiguously manifested assent" to its Privacy Policy in the first place.

In today's "modern world" of "click-wrap and browse-wrap," "empirical data show that only a vanishingly small segment of consumers can give anything approaching meaningful consent." *Domer v. Menard, Inc.*, 116 F.4th 686, 712 (7th Cir. 2024) (Hamilton, J., concurring).

For nearly a decade now, the Seventh Circuit has warned that "a person using the Internet may not realize that she is agreeing to a [privacy policy] at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact." *Sgouros*, 817 F.3d at 1035. As such, where, as here, purported assent is passive, the Seventh Circuit will enforce a given set of terms or policies "'*only if:* … the consumer takes some action, such as clicking a button or checking a box, that *unambiguously manifests his or her assent to those terms.*" *Domer*, 116 F.4th at 695 (majority opinion) (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022)) (emphasis added). Hyatt cannot show that Plaintiff unambiguously manifested his assent here.

Hyatt says that "Plaintiff … consented to the challenged conduct through his unambiguous

acceptance of Hyatt's Privacy Policies," MTD at 2, because he *clicked* past the two interfaces depicted on pages 10 and 13 of Hyatt's MTD. "[B]ut merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything." *Berman*, 30 F.4th at 857. Rather, "[a] user's click of a button can be construed as an unambiguous manifestation of assent *only if* the user is *explicitly advised that the act of clicking will constitute assent* to the terms." *Id.* (emphases added). In other words, the "*language of the site* [must] give the user reasonable notice *that a click will manifest assent*." *Sgouros*, 817 F.3d at 1033-34 (emphasis added).

"This is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Id.* at 1036. However, when a website "fail[s] to do so," courts do not enforce the hyperlinked terms or policies. *Id.* Several cases from this Circuit and others illustrate this point.

For example, in both *Berman*, 30 F.4th at 861, App'x B, and *Anand v. Heath*, 2019 WL 2716213, at *1 (N.D. Ill. June 28, 2019), the courts held that a user's click of the "Continue" button failed to secure users' unambiguous assent. 30 F.4th at 861, App'x B.







"Both webpages stated, 'I understand and agree to the Terms & Conditions,' but they did not indicate to the user what action would constitute assent to those terms and conditions." *Berman*, 30 F.4th at 858. As the court in *Berman*, 30 F.4th at 858, explained:

> [E]ven close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice. Rather, the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here….

Judge Tharp made the same observation in *Anand*, 2019 WL 2716213, at *4:

> The hybridwrap … here is unenforceable because nothing expressly linked the "I understand and agree ..." language to the "Continue" button. There was no "notice informing the user that, by clicking the button, the user [wa]s agreeing to" the terms and conditions.

"This notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the Terms & Conditions.'" *Berman*, 30 F.4th at 858.

Likewise in *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 627-29 (N.D. Ill. 2024), another court held that the following two screens failed to secure a user's assent to a company's terms.







The *Campos* court found both screens problematic. The first screen said: "'By *registering*, you agree to Tubi TV's Terms of Use.'" *Id*. at 632 (emphasis added). But there was no Register button on that first screen, only various "'Continue with …' buttons[.]" "Nothing on the screen indicates that clicking one of the 'Continue with ...' buttons manifests assent to the terms of use; to the contrary, the Prompt indicates that some other action—registering—is required to assent to the TOU. And there is nothing on the first screen of the app that tells one how to register." *Id*.

The second screen, on the other hand, featured the opposite problem. While it contained the elusive "Register" button, "nowhere does it advise that by registering, a customer assents to Tubi's Terms of Use." *Id*. Instead, it simply said: "'We use this information to confirm that you're meeting the age requirement set out in our Terms of Use.'" *Id*. Nor was it appropriate to stitch together the notice on screen one to the action taken on screen two. "Here, the problem is that the warning is divorced from the act of assent, making it unlikely that a prospective user like Campos would receive the warning before performing the act of consent." *Id*. at 634.

Finally, in *Johnson Hum. Power of N Co.*, 767 F. Supp. 3d 845, 849 (N.D. Ill. 2025), Judge Harjani held that the following notice also failed to secure a user's unambiguous assent.




As Judge Harjani highlighted: "The problem for Defendant is that nothing on its advertisement indicates that by clicking the button a consumer is agreeing to abide by the terms." *Id*. at 850. "Instead… it says 'View <u>Terms</u> & <u>Privacy</u>.' But that does not indicate that the consumer will be bound by those terms." *Id*. at 851. "Here, the onus was on Defendant to make clear that a consumer was assenting to the terms by clicking the button; but it did not." *Id*. at 852.

As these cases illustrate: "The phrasing of the disclosure is particularly important given that Defendant has complete control over the language of its own website and could have written the disclosure in any way." *Johnson*, 767 F. Supp. 3d at 851–52. The "hyperlinks and assent features located on Hyatt's booking interface" and "other site features," MTD at 3, all suffer from the same fatal language defects identified in *Berman*, *Anand*, *Johnson*, and *Campos*.

<u>**Hyatt's Registration Page Fails to Expressly Link Agreement To Its Privacy Policy With The JOIN NOW button**</u>. Hyatt argues that Plaintiff "agreed to Hyatt's Privacy Policies," when he clicked past "the following screen" and clicked the JOIN NOW button. MTD at 10.




Yet here, as in all the prior cases, "[t]he problem for Defendant is that nothing on its [website] indicates that by clicking [a] button a consumer is agreeing to" *its Privacy Policies. Johnson*, 767 F. Supp. 3d at 850. Instead, it simply says: "We collect and use your personal information in accordance with our Privacy Policies." But it never explains *how a user is supposed to agree to those Privacy Policies*. This is essentially the same as the failed prompt on the second

*Campos* screen, which said "We use this information to confirm that you're meeting the age requirement set out in our Terms of Use." 716 F. Supp. 3d at 632; *see id.* at 629 (below).




Hyatt repeatedly notes that the transferor court's opinion found that Plaintiff agreed to Hyatt's *Terms and Conditions* on this screen. *See* MTD at 8-10. But that is irrelevant to Hyatt's consent defense, which rests on disclosures made in its separate *Privacy Policies*. As the Seventh Circuit in *Sgouros* explained, "where a website specifically states that clicking means one thing, that click does not bind users to something else." 817 F.3d at 1035. In fact, far from supporting Hyatt's consent defense, the transferor court's order proves Plaintiff's point. There, Judge Birotte held that "[t]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *So*, 2025 WL 2994995, at *7 (quoting *Berman*, 30 F.4th at 858). And with regards to the *Terms & Conditions*, the webpage did exactly that. "[T]he notice stated, 'By joining, you are agreeing to the World of Hyatt *Terms & Conditions*.' Consequently, when Plaintiff clicked the 'JOIN NOW' button … he unambiguously assented to the Membership *Terms*." *Id.* at *7 (emphasis added). However, there was no such notice on the page relating to Hyatt's *Privacy Policies.* That is dispositive. "[N]othing expressly linked" agreement to the Privacy Policies with "the [Join Now] button." *Anand*, 2019 WL 2716213, at *4.

**Hyatt's Terms Themselves Do Not Indicate How A User Agrees To Its Privacy Policies**. Hyatt next argues that the language of the Terms & Conditions themselves manifest assent, because they say: "Please see our Privacy Policy… which is applicable to your participation in the [World of Hyatt] Program." MTD at 10-11 (quoting RJN, Ex. 11 at 2). However, yet again, this language "d[oes] not indicate to the user *what action would constitute assent*" to the Privacy Policy. *Berman*, 30 F.4th at 858 (emphasis added). Again, "nothing expressly linked" agreement

to the Privacy Policies with "the [JOIN NOW] button." *Anand*, 2019 WL 2716213, at *4.

Worse still, the statement that the "Privacy Policy … is applicable" assumes assent was already given. This is a problem: "an unequivocal statement that … [a user] *already was subject* to [a policy] … might give the opposite impression [of what Hyatt intended], conveying not that she was being asked to agree to [the policy] but *instead that the matter was out of her hands and already resolved*." *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 221 (4th Cir. 2024) (emphasis added). And if a user believes the matter was out of his hands and already resolved, then continued participation *could* reflect assent, but it could just as easily reflect indifference or resignation. This is insufficient. *Marshall*, 112 F.4th at 221-22. The test is not a "possible," or even "probable," manifestation of assent. It is an "unambiguous" one. *Domer*, 116 F.4th at 695.

Even if such language were sufficient (it is not), "the warning is divorced from the act of assent, making it unlikely that a prospective user … would receive the warning before performing the act of consent." *Campos*, 716 F. Supp. 3d at 634. Here, the vague warning that the "Privacy Policy … is applicable to your participation in the program" appears on one page (the terms page), whereas the act of joining the program appears on *another* (the registration page).

**<u>Hyatt's Booking Page Likewise Fails To Link The Act Of Booking With Agreement To The Privacy Policies.</u>** Hyatt next argues "all users must consent to the Privacy Policies via the following screen." MTD at 13.




The "I have read and acknowledge" language here is functionally identical to the failed "I understand and agree" language found insufficient in *Berman* and *Anand*. The language never links the click of the BOOK MY STAY button to assent to the Privacy Policies. This is dispositive.

**B. Hyatt's Privacy Policy Does Not Authorize The Data Sharing At Issue Here**

Hyatt's Privacy Policy also cannot establish Plaintiff consented to the sharing of hotel booking information at issue here. To establish consent via a Privacy Policy, Hyatt needs to point to language in the policy that "unambiguously disclose[s] the data collection at issue." *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *8 (N.D. Ill. Oct. 1, 2024) (quoting *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147-48 (9th Cir. 2024)). In other words, "[f]or consent to be actual, the disclosures must 'explicitly notify' users of the conduct at issue." *Calhoun*, 113 F.4th at 1147. "Whether a 'reasonable' user … consented to a particular data collection practice is not to be determined by attributing to that user the skill of an experienced business lawyer or someone who is able to easily ferret through a labyrinth of legal jargon to understand what he or she is consenting to. Instead, a determination of what a 'reasonable' user would have understood must take into account the level of sophistication attributable to the general public." *Calhoun*, 113 F.4th at 1151. This is no easy feat. "In an empirical test of 500 hybrid-wrap digital contracts on popular websites and applications, 99.6% were written at a reading level above that of the average adult." *Domer*, 116 F.4th at 708 (Hamilton, J., concurring) (citation omitted).

Here, at no point does Hyatt's Privacy Policy "explicitly notify" users that it permits Meta and Adobe to collect patrons' guest records on the Hyatt website.

Pointing to page 2 of its Privacy Policy, Hyatt notes that it references "guest stay information," as a "Type[] of Personal Information *We Collect*." MTD at 12 (RJN, Ex. 15, at 2) (emphasis added). But Plaintiff's gripe is *not* that Hyatt, the hotelkeeper, knows what hotel room he stayed in. The thrust of his claim is that Hyatt, the hotelkeeper, breached his trust and *disclosed this data to third parties Meta and Adobe as well*. *See, e.g.*, SAC ¶¶ 2, 88, 95. Hyatt next references page 5 of its Privacy Policy, which states that "*Where permitted by law*, we may work with other companies to share advertisements … The advertisements you see may be based on information collected by us or third parties and/or may be based on your activities on our website or third-party

website." MTD at 12 (quoting RJN, Ex. 15, at 5) (emphasis added). Yet this language only generally states that users' "activities on our website," may be collected, but does not specify *what kinds of activities*. This is not enough; "for a finding of consent, the disclosures must have given users notice of the '*specific practice*' at issue." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (citation omitted). And here, the Privacy Policy's general statement that activities on Hyatt's website may be collected is "akin to the general internet browsing…; the collection of protected [guest records] information from a [hotelkeeper] is a different matter entirely." *Id.* at 794 (rejecting consent defense to ECPA claim).

Worse still, Hyatt's chosen language fails to "explicitly notify" users that *any* third parties are collecting *any* of the activities on Hyatt's website. One clause simply states that "advertisements you see may be based on information collected by us ***or*** third parties." The next clause, prefaced by an "***and/or***," says "advertisements … may be based on your activities on our website ***or*** third-party websites." Hyatt's repeated use of "or" and "and/or" in this sentence renders it practically unintelligible and susceptible to various meanings, only one of which would cover the ECPA claim at issue here.[1] So "a reasonable user would not *necessarily understand* that they were consenting to the data collection at issue." *Calhoun*, 113 F.4th at 1150 (emphasis added).

Finally, Hyatt's Privacy Policy *qualifies* its targeted advertising section with the phrase "[*w*]*here permitted by law*." But Hyatt's disclosure of hotel booking information is *not* permitted by law. The law says a "hotelkeeper … shall not disclose …. any part of a guest record… to a third party without a court-issued subpoena, warrant, or order." Cal. Civ. Code § 53.5. And yet here, Hyatt disclosed hotel booking data to Meta and Adobe *without* a "court-issued subpoena, warrant, or order." So far from proving consent, the Hyatt Privacy Policy could just as easily be read as a

[1] For example, the sentence could mean that advertisements are based on a person's activities on Hyatt's website while being collected by Hyatt. Or it could mean that advertisements are based on a person's activities on third party websites while being collected by third parties.

broken promise to *not* share the very same data that ended up being disclosed here.

### C. Plaintiff States An ECPA Claim

#### 1. Hyatt's Own Participation in Intercepting Plaintiff's Communications Does Not Immunize it of Liability Because it Committed a "tortious act in violation of the … laws … of any State." 18 U.S.C. § 2511 (2)(d).

Hyatt also argues that it cannot be liable for allowing Meta and Adobe to intercept those communications because Plaintiff's allegations regarding the unlawful disclosure of guest records does not satisfy the crime-tort exception.[2] MTD at 6-9. Not so. Defendant's disclosure of guest records in violation of a California law satisfies the crime-tort exception.

The text of the ECPA's crime-tort exception is very broad. It expressly prohibits a party from working with others to intercept its own communications where the "communication is intercepted for the purpose of committing *any* criminal or *tortious act* in violation of … *laws* … *of any State*." 18 U.S.C. § 2511 (2)(d) (emphasis added). For the crime-tort exception to apply, the text of statute only asks whether (1) the defendant committed a "criminal or tortious act" and (2) whether the act "violat[es] ... laws of the United States or of any State." *Id.* And here, it does. First, Hyatt's alleged disclosure of hotel guest records (deemed private under Cal. Civil Code § 53.5) for the purposes of targeted advertising is a tortious act. Indeed, other courts have likewise found that disclosing video viewing records deemed private under the law for the purpose of sending a plaintiff "[t]argeting advertisements … is a significant invasion of personal privacy," akin to "'the public disclosure of private facts common-law analog.'" *Welbel*, 2026 WL 266561, at *2 (citing *Salazar*, 118 F.4th at 544). Second, Plaintiff alleges the disclosure of his private guest records, protected from disclosure under the California Guest Records Statute, Cal. Civ. Code §53.5. "What more is required?" *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1025 (7th Cir. 2025).

[2] The crime tort-exception is the exception to Hyatt's proffered "party-exception." MTD at 5. "[A] party to the conversation is free to intercept its own communications [the party-exception], unless it does so for the purpose of committing an act that is a crime or a tort." *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025).

Against this common-sense reading, Hyatt launches a series of arguments at odds with the plain text of the statute and the overwhelming weight of authority in this Circuit and others.

**The California Guest Records Statute Is As Valid A Legal Predicate As Any**. Hyatt argues that "no court has [yet] recognized a violation of the [Guest Records] statute as a freestanding tort … sufficient to serve as a basis for the ECPA's crime-tort exception." MTD at 6-7. But the same criticism could have been levied in dozens of other cases, where plaintiffs proposed new state and federal laws to serve as ECPA crime-tort predicates. Perhaps most recently, Judge Rowland denied a motion to dismiss an ECPA claim on the basis of a crime-tort exception where a plaintiff relied on "violations of VPPA and FERPA" as the "predicate criminal or tortious act," *Dawson v. Univ. of Phoenix, Inc.*, 2026 WL 92248, at *13 (N.D. Ill. Jan. 13, 2026), even though, up until then, there does not appear to have any other court which had relied on that those two particular statutes in invoking the crime tort exception.

Judge Rowland nevertheless held that plaintiff plausibly pled the crime-tort exception by alleging "Defendant procured third-party entities for the purpose of intercepting communications and obtaining data from students and other users of the University's website despite being *protected from disclosure by law.*" *Dawson v.*, 2026 WL 92248, at *15 (emphasis added). In particular, VPPA prohibits a "video tape service provider" from" knowingly disclos[ing]… personally identifiable information" without "informed, written consent" of a consumer, 18 U.S.C. § 2710(b)(1)-(2), and FERPA prohibit[s] federal funding to any "educational agency or institution which has a policy or practice of permitting the release of education records … of students without the written consent of their parent," 20 U.S.C. § 1232g(b)(1). Many other courts, including this one, have found the crime-tort exception applied where a defendant worked with third-parties to violate HIPAA, which prohibits "'disclosing individually identifiable health information' (again, IIHI) to a third party," without the patient's consent. *Kurowski v. Rush Sys. for Health*, 2023 WL

8544084, at *2 (N.D. Ill. Dec. 11, 2023) (Kennelly, J.). Nor have courts limited the crime-tort exception's reach to federal statutes. To the contrary, the "crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims." *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) (collecting cases). Indeed, "[c]ourts around the country, … have permitted the invocation of the ECPA's crime-tort exception when plaintiffs allege violations of … state health privacy laws." *Lugo v. Inova Health Care Servs.*, 2025 WL 905191, at *6 (E.D. Va. Mar. 25, 2025) (collecting cases) (Virginia health privacy law served as state analog to HIPAA); *see also, e.g.*, *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 719–20 (D. Minn. 2023) (various Minnesota health privacy laws served as crime-tort predicates). Courts have even found that "state law[] [ [privacy torts like] intrusion upon seclusion, and invasion of privacy," can serve as the crime-tort predicate. *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021). Like the various state and federal statutes which "protect from disclosure," *Dawson*, 2026 WL 92248, at *15, various health, video-viewing, and educational records, the California Guest Records Statute here says a "hotelkeeper … shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, ... all or any part of a guest record ..." Cal. Civ. Code § 53.5.

Against the weight of this authority, Hyatt fails to identify a single valid reason why California's Guest Record Statute should be treated differently. Hyatt only protests that "[t]he Guest Record State has no private right of action." MTD at 6. But "HIPAA… [likewise] provides no private right of action," *Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1015 (7th Cir. 2019), and yet "[c]ourts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception under the ECPA." *Stein*, 2025 WL 580556, at *5 (N.D. Ill. Feb. 21, 2025).

Questioning the California legislature's judgment, Hyatt also calls it an "absurdity" to think "casual inquiries in hotel lobbies carry … privacy expectations." MTD at 7-8. But this argument

proves too much. The VPPA was enacted because reporters discovered which "films … Judge Robert Bork and his family had rented from a video store," even other video store patrons could likewise see, *in plain view*, which videos Judge Bork rented. *Salazar*, 118 F.4th at 544. That "[t]he reporters did not turn up any dirt," because "Bork and his family watched Hitchcock mysteries," was beside the point. *Gardner*, 132 F.4th at 1023. It was "the ready availability of rental information [that] caused consternation in Congress, some members of which may have had other viewing predilections." *Gardner*, 132 F.4th at 1023. In most cases, the disclosure of video, health, or educational records would not reveal anything particularly salacious—that someone likes Hitchcock, that they got an annual check-up, or that they passed algebra. But sometimes, they might. Guest records are no different. In most cases, they may reveal someone went on a family or business trip. But other times, they could reveal where a domestic violence survivor is hiding from her abuser—and that, perhaps, may be what gave California lawmakers some "consternation." *Gardner*, 132 F.4th at 1023.

**<u>Hyatt's Choice-of Law Clause Cannot Restrict the ECPA's "any State" Predicate</u>**. Hyatt also seems to argue that Plaintiff can only rely on the California Guest Record Statute as the predicate of his federal ECPA because of its Illinois choice-of law clause. *See* MTD at 9-10. This argument mixes the issues. Plaintiff brought an ECPA claim, which is a federal law. And "[f]ederal law[s]… are as much laws in the States as laws passed by the state legislature." *Howlett*, 496 U.S. at 367. "The Supremacy Clause of the federal Constitution *requires* Illinois to treat *federal law as part of state law*." *Arres*, 333 F.3d at 814 (emphasis added). So "[t]o the extent that a contractual choice-of-law provision provides that the law of a specific state shall apply, this includes federal law." *Mudd-Lyman Sales & Serv. Corp. v. United Parcel Serv., Inc.*, 236 F. Supp. 2d 907, 910 (N.D. Ill. 2002). In other words, for all practical and legal purposes, Plaintiff's ECPA claim *is* an Illinois state law claim.

And the ECPA—the Illinois state law at issue here—in turn, provides that Plaintiff can rely on "the laws … of *any* State" to serve as the crime-tort predicate. 18 U.S.C. § 2511 (2)(d). "'State' means any State of the United States, ... and any territory or possession of the United States[.]" 18 U.S.C. § 2510(3). Here, Plaintiff relies on the laws of the state of California. For the purposes of the ECPA's crime-tort exception, its laws are as valid as *any* other.

Hyatt's choice of law clause requires us to follow the laws of Illinois state, but it cannot change what that those laws say. And here, the ECPA, a law of Illinois state, says that, for the purpose of invoking the crime-tort exception, "the laws … of *any* State" will do.

**Hyatt's Financial Motives Do Not Immunize It Of Liability**. Hyatt further argues that it should be absolved of liability because Plaintiff's "web-tracking allegations … simply describe efforts to generate revenue." MTD at 6. But as this Court noted, "[m]any crimes and torts are motivated by a desire to make money, and 'it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 WL 3455020, at *5. Indeed, "[t]he annals of history are chock-full of villains who have a financial motivation – Madoff, Dr. Evil, and Al Capone, to name a few." *Stein*, 2025 WL 580556, at *6. Indeed, several other courts from this District have joined this Court in rejecting Hyatt's argument. *See id.*; *A.D. v. Aspen Dental Mgmt., Inc.*, 2024 WL 4119153, at *3 (N.D. Ill. Sept. 9, 2024) (invoking crime-tort exception even though defendants' "only purpose was to improve its marketing and boost its revenues."); *Allen v. Midwest Express Care, Inc.*, 2025 WL 2240253, at *3 (N.D. Ill. Aug. 6, 2025) ("Even if Defendant argues that its motivation was for financial gain ... such revenue could only be gained by committing a HIPAA violation."); *Smith v. Loyola Univ. Med. Ctr.*, 2024 WL 3338941, at *7 (N.D. Ill. July 9, 2024) (invoking crime-tort exception where the "disclosure of their personal health information was done … to bolster profits via targeted marketing.").

This Court further rejected Hyatt's argument that the "purpose" language of § 2511(2)(d) superimposes a heightened willfulness requirement like a "'specific intent' to knowingly violate a separate law." MTD at 6. This Court found "no persuasive reason to read a heightened willfulness requirement into the crime-or-tort exception," given that such readings were reserved for "'highly technical statutes.'" *Kurowski*, 2024 WL 3455020, at *4 (citing *Bryan v. United States*, 524 U.S. 184, 194 (1998)). "But the 'purpose' requirement of the statutory provision at issue here, section 2511(2)(d), applies to 'any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.' That sweeps in both sophisticated offenses and straightforward ones." *Id*. Section 53.5's prohibition on disclosing guest records—is a straightforward statute that bars hotelkeepers from disclosing records identifying their guests to third parties. No government bulletin or judicial pronouncement is needed to understand that secretly transmitting a hotel guest's booking details and personal identifiers to advertising companies violates that prohibition.

Even if the Court *were* to impose a heightened scienter requirement, Plaintiffs' allegations sufficiently plead it. 2024 WL 3455020, at *4. Just as the *Kurowski* defendant actively chose to deploy tracking on pages "likely to contain" individually identifiable health information, *id.*, here, Hyatt actively chose to deploy tracking on every page of its booking flow—pages designed to capture guest records. SAC ¶¶ 3, 22-24. Hyatt knew users would type in their name, email address, and phone number while booking their hotel rooms. *See* SAC ¶ 25, Figure 5, and ¶ 26. And Meta and Adobe's marketing said their tracking technologies would capture names, emails, phone numbers, and users' actions, on those very same pages. *Id*. ¶¶ 32, 51–52, 61–63.

**<u>Plaintiff Sufficiently Pled A Violation Of the California Guest Records Statute</u>**. Hyatt's argument that none of the intercepted data constitutes a "guest record," MTD at 7, ignores the SAC's detailed allegations about how the intercepted booking data is *paired with identifying information*. The SAC does not merely allege that travel dates and destination data were shared in

a vacuum. Rather, it alleges that the "data collected by Adobe and Meta" included "contact details (i.e., name, email address, phone number, etc.) [which] are sufficient to identify individuals." *Id.* ¶ 15. In particular, Plaintiff alleges Hyatt enabled Meta to identify individual website through Meta's "Automatic Advanced Matching" feature, which "configured the [Meta] pixel to scan form fields containing a user's email address, first name, last name, phone number." *Id.* ¶ 62. Meta's marketing confirms this data is then used to link individuals Facebook users to the hotels bookings they make on Hyatt's website. *Id.* ¶ 34 ("advanced matching … can help … *match more of the conversions that happen on your website* to people on Meta.") (emphasis added, quoting marketing material). The SAC likewise alleges that Adobe links the same kinds of information through its Adobe Audience Manager and the Adobe Experience Platform Identity Service. *Id*. ¶¶ 31-32. In particular, the "Adobe Audience Manager… collects 'raw data … and [] user interactions on [] websites,'" *id*. ¶ 31, and the Adobe Experience Cloud Identity Service, in turn, collects both "'[e]mail addresses'; and '[p]hone numbers,'… to gain a comprehensive 'view of individual customers and their behavior' and identify them 'across all applications,'" *id*. at ¶ 32.

These are guest records because they "identif[y] an individual guest." Cal. Civ. Code § 53.5 (c). Here, Meta collects guest's names and phone numbers, SAC ¶ 62, and Adobe has the ability to collect guests' emails and phone numbers, *id.* ¶¶ 32. The statute expressly says the term includes but is "not limited to" "their name, … [or] telephone number[.]" Cal. Civ. Code § 53.5 (c). Moreover, Meta is configured to collect, and Adobe has the ability to collect email addresses, *id.* ¶¶ 32 and 62, and numerous courts have found that "[e]mail addresses fall within the ordinary meaning of 'information that identifies an individual.'" *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017). This information further identifies individuals as "guests" of the hotel because "Defendant other disclosed to Adobe and Meta… the fact that [these] users actually booked a hotel stay." SAC ¶ 93; *accord id.* ¶ 3 (alleging that "Plaintiff So … booked a Hyatt hotel"

and that this "was intercepted in transit by the Third Parties.").

Hyatt's reliance on *Crano v. Sojern, Inc.*, 2025 WL 2689267 (N.D. Cal. Sept. 19, 2025), and *Snyder v. G6 Hosp. LLC*, 2025 WL 1254382, at *1 (C.D. Cal. Apr. 14, 2025), is misplaced. *See* MTD at 7. In *Crano*, it was not even apparent in the opinion *what identifying information* was even shared with third-parties. 2025 WL 2689267, at *6. Instead, the information in *Crano* generally "'identified … the fact that Plaintiff [] completed her reservations," 2025 WL 2689267, at *6 (quoting paragraph 4 of complaint), but did not specify whether information collected was, for example, a name, phone number or email addresses, or cookie. *See id.*, at *8. Here, in contrast, Plaintiff alleged in granular detail that Meta and Adobe's tracking technologies were configured or had the ability to collect his name, phone number, and email address, and *link* those identifiers to the fact he booked rooms at Hyatt hotels. SAC ¶¶ 15, 31-32, 34, 61-63, and 93. Likewise, in *Snyder*, plaintiff alleged that a hotel shared his "username," but did not "explain how" this fell within the statute's definition of "guest records," and did not plausibly allege that the hotel shared his "Facebook ID," as opposed to Meta assigning it to him. 2025 WL 1254382, at *4. Here Plaintiff alleges *Hyatt* enabled the Meta technologies to "compel [his] browser to transmit several cookies" containing unique identifiers, including the "unencrypted Facebook ID." SAC ¶¶ 53-60. And in any event, the SAC alleges that the technologies were configured and/or had the ability to collect names, emails, and phone numbers, *from Hyatt's website* via "form fields." *Id.* ¶ 62.

Citing no authority, Hyatt argues that the names, emails, and phone numbers shared with Meta do not deserve any protection because they were "hashed." MTD at 7.[3] But courts expressly reject this distinction. In the video privacy context, courts routinely find hashed data would be

[3] Hyatt also falsely states that "*any* shared data was hashed" MTD at 7 (emphasis added). This is not true. The *only* information the SAC alleges was hashed were the disclosures of names, phone numbers, and emails to Meta through advanced matching. SAC ¶ 62. The SAC does not allege disclosures to Adobe were hashed, nor does it allege users' Facebook ID or any hotel booking information sent to Meta or Adobe was hashed. To the contrary, the SAC contains screenshots showing that the hotel booking information shared with Meta and Adobe was *unencrypted*.

personally identifiable, because "[n]o one would deny that I would violate the VPPA by passing someone an encrypted list of Judge Bork's video rentals—if my recipient and I both understood that we would use a mutually intelligible code." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015). That names get morphed into "a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names." *Dawson*, 2026 WL 92248, at *8.

**2. <u>Plaintiff's Communications Were Intercepted In Transit</u>**

Hyatt argues Plaintiff does not plausibly allege interception "in transit" because the alleged communications were "duplicates." MTD at 15–16. But the Seventh Circuit has already held that such simultaneous duplication constitutes interception. *United States v. Szymuszkiewicz*, 622 F.3d 701, 705-06 (7th Cir. 2010). In *Szymuszkiewicz*, 622 F.3d at 706, the Seventh Circuit held that a program that caused copies of emails to be simultaneously sent to a third party constituted contemporaneous "interception" under the Wiretap Act, even though the original emails still reached their intended recipients. "Even if [the user's] computer (rather than the server) was doing the duplication and forwarding, … the Act has been violated." *Id*. at 706. Likewise, here, Meta and Adobe's trackers duplicate messages "within milliseconds." SAC ¶ 27. So "if both [Hyatt] and [Meta or Adobe] were sitting at their computers at the same time, they would have received each message with no more than an eyeblink in between. That's contemporaneous by any standard." *Szymuszkiewicz*, 622 F.3d at 706.

**3. <u>Plaintiff's Hotel Bookings Were Communicative Content</u>**

Contrary to Hyatt's arguments, the intercepted data is not mere "record information," but the substance of the "message conveyed by the communication" to the recipient. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1104-06 (9th Cir. 2014). When users use Hyatt's website, they communicate as they would with a hotel concierge. Users are asked where they would like to visit, when they would like to check-in and check-out, how many rooms and guests they would have with them,

what rate they would apply, along with their names, emails and phone numbers. SAC ¶¶ 22-25 (Website Screens 1 through 5). The complaint alleges responses to such questions are "San Diego, California," "checkinDate=2025-02-19"; "'checkoutDate=2025-02-20"; "rooms=1"; "adults=2"; "kids=0"." *Id*. ¶¶ 40 and 44. These are plainly the "substance of the message conveyed."

#### 4. Hyatt's Use Of Trackers For Targeting Advertising Is "Procurement"

Misciting *Valentine v. Wideopen W. Fin., LLC*, 288 F.R.D. 407, 412–13 (N.D. Ill. 2012), Hyatt finally claims that Plaintiff "cannot proceed with a civil claim against Hyatt based on allegations of 'procurement.'" MTD at 17. This is untrue. The court in *Valentine* simply held there was no secondary liability for procurement. But it went to clarify that "[t]he procurer of an interception has indeed engaged in a violation of § 2511(a), and may thus be sued by the person whose communication was intercepted. This interpretation also makes sense because the procurer of a violation—the one who brings about the violation—is not secondarily liable as that term is usually understood; the procurer is the *principal,* not the merely secondary actor." *Valentine*, 288 F.R.D. at 412, n.3. Other courts dealing with the same Meta Pixel tracking technology at issue here, following *Valentine*, have likewise held that "Plaintiff may lodge a civil claim for procurement liability." *Dawson*, 2026 WL 92248, at *14.

### D. Hyatt's Motion To Strike Is Premature

Hyatt's motion to strike the class allegations should be denied as "premature" because discovery is not completed. *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 296 (N.D. Ill. 2014). And Hyatt's attempts to limit Plaintiff's ECPA class to only Californians lacks merit. The ECPA is a federal law that applies to all fifty states, and expressly says that the crime-tort exception can be satisfied by reference to the laws of "any" one of those states. 18 U.S.C. § 2511 (2)(d). And the question of whether unique identifiers, names, phone numbers, and/or email addresses are "guest records" is not an individualized inquiry.

Dated: February 26, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *__/s/ Philip L. Fraietta__*
Philip L. Fraietta

**BURSOR & FISHER, P.A.**

Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914)-874-0710
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (*pro hac vice*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*